RYDER et al. v. BATEMAN et ux.

(Circuit Court, W. D. Tennessee. October 3, 1898.)

1. EQUITY PRACTICE—REQUIRING PRODUCTION OF DOCUMENTS—RULES IN FED- ERAL COURTS OF EQUITY.

Rev. St. § 724, is designed merely to give courts of law of the United States the power to require the production of documents to obviate the necessity of parties going into equity with a bill of discovery for that pur- pose in aid of an action at law, and in no way affects the practice of federal courts of equity, which is governed by the general equity rules prescribed by the supreme court, and where they do not apply by the

practice of the high court of chancery of England at the time those rules were promulgated in 1842.

**2. SAME—RIGHT TO INSPECTION OF DOCUMENTS BEFORE ANSWER.**

A federal court of equity will not compel a plaintiff to produce for inspection a deed on which rights in real property alleged in the bill are founded, and a copy of which is attached to the bill as an exhibit on a petition of defendant before answer alleging that such deed is a forgery, but, if genuine, was obtained by fraud; nor will the court enlarge the time for answering until the deed has been filed with the clerk. No litigant can be compelled, as a matter of general right, to produce his evidence for the inspection of his adversary in advance of the hearing, and the defendant is not entitled to an inspection of the deed to enable him to form an opinion as to its genuineness, and thus determine which of the two inconsistent defenses he will make, but he is required to answer the bill in accordance with his knowledge and the facts.

On Motion to Require the Production of an Exhibit for Inspection.

L. T. M. Canada, for plaintiffs.

Edgington & Edgington, for defendants.

HAMMOND, J. This is an application by the defendants, upon a sworn petition, to have the plaintiffs produce and file with the clerk for their inspection a certain deed mentioned by the plaintiffs in their bill as "Exhibit D" thereto, or else have an order enlarging the time of the defendants to file their answer until a given time after the plaintiffs shall have filed the original of the said deed with the clerk for that purpose. The bill makes a copy of the original deed an exhibit to the bill, but it is stated in this petition that the plaintiff Iris C. Ryder has repeatedly refused to permit the defendants to see the original. The defendants say, in their sworn petition, "that the said deed is a forgery, and that no such deed was ever made by the said defendant Marie." Again, they say, "Respondent Marie has no recollection or knowledge of the execution, signing, or acknowledgment of the document sued on, and, if the signature to the same should prove to be her genuine signature, then it was obtained by fraud." The defendants further say in their petition that the deed purports to have been acknowledged in Los Angeles county, Cal., before a notary public, and they believe that this acknowledgment is also a forgery, and do not believe that it is the genuine signature and seal of the notary public attached to said deed; and, if it be so attached, that it is a forgery. The defendants say, also, in the petition, that they will not be enabled to answer the bill intelligently without an inspection of this paper, to the end "that they shall have proper facilities to prepare the evidence for the defense of this case." And they ask to have all further proceedings stayed until they have secured an inspection of the original document. It also appears by the statements of counsel and by the record that the plaintiffs have moved for the appointment of a receiver for the considerable quantity of real estate involved in the controversy; and the defendants, before the hearing of the motion for a receiver, desire to file their answer to the bill, and this they cannot do until they have inspected the plaintiffs' exhibit. For this reason there has been considerable urgency about this application.

The plaintiff Iris C. Ryder has filed an answer to this petition of the defendants, also sworn to, denying that the deed is a forgery,

and stating that on or before the hearing of this cause she will produce the paper, and establish its genuineness; that she has made a copy of the paper an exhibit to her bill; and states in the bill that on or before the hearing she will produce the paper, or a certified copy thereof, as legal evidence. She states that the petition is filed only for delay; that the defendants are totally insolvent, and are squandering the rents of the property; and that the defendant Louis Bateman is an unscrupulous man, not to be trusted with papers; and asks to have the motion for the receiver heard without further delay.

This application must be denied. It is a great mistake to suppose that parties to a litigation have a promiscuous right to the production and inspection of the papers and documents in the possession of their adversary. A loose practice has grown up on this subject, and there is generally a good deal of complaisance on the part of counsel and the parties to the suit in the production of papers; but whenever the practice has been challenged it has been found that there are limitations to the right, which it is necessary that the courts should safely guard, in order to secure the citizen against an invasion of his right to hold and keep his papers from unlawful or impertinent inspection. Even litigants who expect to use their papers in evidence are not required to produce them for the information of the other side, except under strictly guarded rules of practice that are intended to secure the protection of this right. Mr. Justice Bradley, in the case of Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, denounces the practice of invading this right under the forms of law by judicial process, and shows how it is guarded in criminal procedure by a constitutional provision; which was also enforced in the case of Potter v. Beal, 2 C. C. A. 60, 50 Fed. 860, by annulling an order that had been granted for the inspection of papers in a criminal case. There is, perhaps, no constitutional provision to protect the citizen against seizures and searches in civil suits, as in criminal cases, but it will be found, nevertheless, that the courts carefully avoid any unlawful violation of the citizen's right in respect of this protection. Railroad Co. v. Botsford, 141 U. S. 250, 254, 11 Sup. Ct. 1000.

Lord Chancellor Selborne remarks, in Minet v. Morgan, 8 Ch. App. 361, 364, that "there might, perhaps, be great reason for holding that, if a man comes into court as plaintiff, attacking somebody else, he ought to be bound to disclose everything on which he relies for the purpose of his attack. But undoubtedly that is not the present rule of the court"; wherefore it is required that we shall determine under just what circumstances the parties have the right to compel each other to produce documents for the inspection or use of the adversary in the litigation.

Counsel, in their brief, refer to the judiciary act of 1789 (1 Stat. 82, c. 20, § 15), which is now Rev. St. § 724, as furnishing authority on the part of the court to make this order. But it will be seen that this act is confined to actions at law, and does not at all apply to courts of equity. The only purpose and effect of that act is to give courts of law the power to do what courts of equity may do in the matter of producing documents without the formality of going into a court of equity

93 F.—3

with a bill of discovery in aid of an action at law. Story, Eq. Pl. p. 106, § 555, note; Railway Co. v. Botsford, supra. Mr. Justice Bradley, in Boyd v. U. S., supra, refers to this statute, and praises the wisdom of congress in strictly limiting the right of production to "cases and under circumstances where the parties might be compelled to produce books and writings by the ordinary rules of proceeding in chancery." He says: "The court of chancery had for generations been weighing and balancing the rules to be observed in granting discovery on bills filed for that purpose, in the endeavor to fix upon such as would best secure the ends of justice. To go beyond the point to which that court had gone may well have been hazardous." 116 U. S. 631, 6 Sup. Ct. 533. It will thus be seen that the supreme court of the United States, by this interpretation, limits the power of courts of law, under this act of congress, to precisely the power that courts of equity have to compel the production of documents. And it becomes, therefore, all the more important to determine how courts of equity proceed in the exercise of their power to subserve the ends of justice, and at the same time protect the litigant against unlawful compulsion in the matter of the production of his evidence to the inspection of his adversary.

There has been in recent years, by legislation in parliament in England and in the legislatures of the states, a very decided reform in the matter of procedure, the purpose being to avoid the cost and expense of bills of discovery to compel the production of documents which, under the rules governing courts of equity, should be produced, by authorizing all courts to compel the production upon motion made by the parties, without the formality of bills of discovery. An example of this legislation will be found in St. 15 & 16 Vict. c. 18, § 20, which allowed the parties after answer, under certain circumstances, to secure the production of documents by petition; and by more recent legislation in England, and by orders of court, the practice has been entirely changed, and the production is enforced upon a proceeding by affidavit. Another example is found in the New Jersey equity rule 31, that being a state where equity practice is still preserved in its original form and purity to a great extent. That rule allows the inspection to be had without a bill of discovery, and upon motion. Dick. Eq. Prec. 151, 208. But it is to be observed that in all this legislation the courts are careful, while changing the methods of procedure, not to change the fundamental principles which govern the exercise of the right of compelling the production of documents; no doubt actuated by the same wisdom which Mr. Justice Bradley attributes to congress in conferring this enlarged power upon the federal courts in actions at law. Congress has not yet chosen to change the method of procedure in the federal courts of equity, and the very fact that Rev. St. § 724, is confined to courts of law, is conclusive that the courts of equity must proceed as they did and do without the aid of that statute. We are governed by the general equity rules prescribed by the supreme court of the United States, and, where they do not apply, by the practice of the high court of chancery in England at the time of the promulgation of those rules, in 1842. Equity rule 90; Bein v. Heath, 12 How. 163,

178; Betts v. Lewis, 19 How. 72. It will be found that that elaborate system of rules was largely intended to settle many disputed questions of chancery practice, but unfortunately they did not take up this question of the production of documents, and there is no rule governing the practice. We must find the correct practice from other sources, as also the particular circumstances entitling the parties to the production of documents as against each other.

Mr. Justice Bradley, in the Boyd Case, cites Pollock on the Production of Documents, an old English work, which I have been unable to procure. And there is another work, Wigram on Discovery, which also I have been unable to consult. It appears that there has been a good deal of conflict of authority on this subject. However, before we examine the authorities which govern the right and the practice, it will be well enough to understand precisely what is wanted in this case. The petition discloses the fact that the defendant is uncertain whether she actually signed the deed of which inspection is wanted or not, and says that, if the signature should prove to be genuine, then it was obtained by fraud. Evidently what is wanted is an aid to the defendant's memory to determine whether she signed the document or not. She certainly knows, or ought to know, whether, as a fact, she signed any deed transferring the property in controversy; and it is not unreasonable to require her to answer according to her knowledge and her memory, and not to give her the choice of determining whether the deed is a forgery, or a genuine document signed by her, according as she shall determine whether the signature to the document is genuine or not by looking at it. It is not her opinion whether the actual signature to the document is in her own handwriting which the plaintiffs want by her answer and demand by their bill. It is her knowledge of the fact whether she transferred her property according to the purport of that document that the plaintiffs demand by their bill. And they have a right to her answer to that demand from her own knowledge of the fact. Again, the defendant knows, or ought to know, now, and should be able to state without an inspection of the document, whether or not there be in existence facts and circumstances or events which constitute a fraud in procuring her genuine signature to that document; and it would seem that justice would require that she should select which of the two alternative defenses she suggests by this petition she will make, without any aid from an inspection of the plaintiffs' document and muniment of title. The two defenses are obviously inconsistent with each other. The deed cannot be at the same time a forgery and a genuine signature obtained under circumstances which invalidate it for some fraud committed against the defendant; and it is plain from the face of the petition that what she really wants is to see the paper before she chooses any defense. If she and those she may call upon to pass their judgment upon the genuineness of the signature should say that it is a forgery, then she will declare by her answer that it is a forgery; but, if she recognizes it as a genuine signature, then she will set up other facts and other circumstances in defense of the bill, which will avoid the deed upon some ground of "fraud."

Is it not entirely obvious that there is no principle of justice which requires, under any circumstances, that a defendant should have this advantage in determining what defense she will make, but that real justice requires that she shall answer according to her knowledge and according to the facts, without any alternative choice about the matter? Hence it would seem that under any method of procedure or under any rule of right upon this subject, which leaves open, to be determined in any way, a question of inspection, it should be denied, under circumstances like these, until after the defendant has made her choice of defenses, if she supposes she has a choice under such a state of facts. No cause could better illustrate than this the wisdom of the rule declared in the cases that every litigant has the right to reserve the proofs that establish his case until the hearing thereof, and is not bound to advise his adversary of the strength of his case in order to enable him most successfully to defend against it; in order to enable him to do what is proposed in this case,— choose whether the defendant shall set up one of two antagonistic and incongruous defenses. She ought to be able to defend according to the facts, without such choice, if the defense be honest.

The celebrated case of Princess of Wales v. Earl of Liverpool, 1 Swanst. 114, 1 Wils. Ch. 113, and 2 Wils. Ch. 29, is the leading case in favor of this application by the defendants for an inspection of the plaintiffs' document. It was there held that the proper order is not one to produce the document for inspection, but to enlarge the time of the defendant for answering the bill until such time as the plaintiffs shall deposit the document with the clerk of the court for the inspection of the defendant; and that order was made in that case. It was a bill against executors seeking an account and payment of two promissory notes made by the testator. The defendants did not charge forgery in the plain terms of this petition we have before us, but in the polite language of social diplomacy applicable to instruments set up by a princess of Wales they did say that when they had seen the promissory notes some time before they "appeared not equal in handwriting, construction, and spelling to the late duke's, and the form of the signature seemed unusual." A motion was made to have these documents produced and inspected by defendants before making answer to the bill. It was at first refused by Lord Eldon until the affidavit was made more specific and in the language above quoted. He afterwards, however, allowed the order, and gave, in an elaborate opinion, his reasons for doing so. The solicitor general, in his argument in favor of the motion, called attention to the exceptional circumstance that it was a bill against a dead man, and his executors could not know whether the signatures were genuine until they had seen them; whereas, if the defendant had been living, he would be able to make answer from his own knowledge of the fact of signing the paper, and therefore the order then might not be appropriate. There were other "specialties," as some of the judges in subsequent cases remark, about this case, growing out of the relationship of the plaintiff to the deceased duke, her brother; but it is not necessary to call particular attention to them here. The lord chancellor's opinion is very instructive, but requires full and

careful reading to understand the reason for his decision; and it is evident from the face of it that he was struggling against the common rule to find an exception in that case. He said that, if the defendant wants the production of deeds from the plaintiff, who has not said what, by his bill, he may say,—that he has left the instruments in the hands of the clerk that the defendant may inspect them in order to answer the interrogatories that are propounded thereon,—then he must file a cross bill, but the defendant cannot have an answer to his cross bill for the discovery until he has answered the original bill. Therefore, if the peculiar circumstances require that he must see the paper before answering the bill, necessarily there must be some relaxation and exception to the general rule, or there would be worked an injustice to the defendant. He then quotes from the Practical Register, the great authority on chancery practice in that day, that under such circumstances the plaintiff shall give the defendant a copy of the instrument. Mark, the Practical Register says only a copy; but the lord chancellor proceeded to find the special circumstances in this case which constituted an exception to the general rule, and made the order that the defendants should not be required to answer until a fortnight after the plaintiff had deposited the notes with the clerk in court. The princess never did deposit the notes, and after some 18 months' delay the bill was dismissed for noncompliance with the order.

This case of the Princess of Wales was stigmatized by Chancellor Walworth in Kelly v. Eckford, 5 Paige, 548, as "a political decision," and he says it had always been so considered. Certainly, judges who have subsequently considered it in England have dissented from it as not being founded on any sound reasoning, and it is there regarded as having been overruled.

In Penfold v. Nunn, 5 Sim. 409, Vice Chancellor Shadwell ruled that: "The court will not, on motion of defendant, compel a plaintiff to produce documents in his possession, although the defendant swears that an inspection of them is necessary to enable him to answer the bill. He must file a bill of discovery." The opinion denies the authority of the Princess of Wales Case, and directly refuses to follow it.

In Milligan v. Mitchell, 6 Sim. 186, Vice Chancellor Shadwell again rules that: "It is contrary to the general tenor of the practice of this court to order a plaintiff, on the application of the defendant, to produce a document in his custody; and I do not think I am bound to follow the decision in Princess of Wales v. Earl of Liverpool except in a case precisely similar to it. There were specialties in that case that do not occur in this."

In Pickering v. Rigby, 18 Ves. 484, Lord Eldon himself refused the motion even in a partnership case, which has generally been considered to be an exception to the general rule, because partners have an equal interest and ownership in the documents belonging to the firm. The lord chancellor required a cross bill in that case. And again, in Maund v. Allies, 4 Mylne & C. 503, the lord chancellor again refused an order for the inspection of the plaintiff's document where there was a partnership, and one of the partners was receiver, except so far as

his receiver's books were concerned. In this case the court quoted the remark of Lord Langdale in Wedderburn v. Wedderburn, 2 Beav. 212, that the courts have certainly sometimes shown astuteness in making these orders. Counsel had said that the court would sometimes labor indirectly to make such orders, but always repudiated jurisdiction to do so when brought face to face with it; and then it was that Lord Langdale made the above remark, and referred to Shepherd v. Morris, 1 Beav. 175, 4 Beav. 252, which was a case where the court refused the order for inspection, but again, as in the Princess of Wales Case, did enlarge the time to make the answer until after the plaintiff had filed the documents with the clerk.

In Wiley v. Pistor, 7 Ves. 411, Lord Eldon again refused the motion to inspect the plaintiff's documents, although they had been made exhibits to a deposition which he had taken in the case.

In Micklethwait v. Moore, 3 Mer. 292, Lord Eldon much discussed the question, and again refused the motion for the production of documents, and held that a cross bill must be filed; and he said in that case that even a plaintiff, although he has the right to inspect deeds admitted by the defendant's answer to be in his possession, on which his own title rests, cannot compel the production of those relating only to the defendant's own title. And it will be seen from the authorities that the plaintiff has a much larger right to inspect the documents of the defendant which the defendant has filed in his answer than the defendant can ever have as against the plaintiff, for the reason that the plaintiff's bill, even where it is not strictly or technically a bill for discovery, calls upon the defendant to answer specifically as to the allegations of the bill; and so, when the defendant, in his answer, refers to documents in his possession in such a way as to make them a part of his answer, the plaintiff may, without a bill of discovery, by motion compel the defendant to produce the documents for his inspection. But this right of the plaintiff to inspect the defendant's documents is limited to particular cases, and is carefully guarded by the courts, so as not to intrude upon the right of a litigant to keep possession of his own proof until he chooses in the usual way to produce it at the hearing. Atkyns v. Wryght, 14 Ves. 211.

In Brown v. Newall, 2 Mylne & C. 558, at page 573, Lord Chancellor Cottenham refers rather contemptuously to the Princess of Wales Case, and decides that the right of inspection does not exist; quoting approvingly Lord Thurlow in Anon., 2 Dickens, 778, as follows: "Did you ever know an instance of a defendant's applying against a plaintiff even to produce deeds? There cannot be any. It hath been denied. If you want it, you must file a cross bill for the purpose."

In Burton v. Neville, 2 Cox, Ch. 242, Lord Chancellor Thurlow refused an order upon the defendant to produce papers which had not been submitted by him to be produced, saying the courts have never gone beyond the case where the parties had a common interest in the paper.

In Spragg v. Corner, 2 Cox, Ch. 109, the defendant moved to have the plaintiff leave with the clerk a deed, it being stated by the bill that it was in the "plaintiff's custody, and ready to be produced as the

court should direct." Here Lord Chancellor Thurlow said that, "As the motion is not consented to, it was totally impossible, for it is a universal principle that, if the defendant wants discovery of any deed in the hands of the plaintiff, he must file a cross bill for the purpose."

In the case of Jackson v. Sedgwick, 2 Wils. Ch. 167, the application was refused and the Princess of Wales Case was explained.

In Davers v. Davers, 2 P. Wms. 410, the master of the rolls had granted an order on the defendant's petition to inspect a deed which had been referred to in a deposition taken by the plaintiff; and that order the lord chancellor discharged, "for that the other side had no right to see the strength of the plaintiff's cause or evidence of title before the hearing, and no such order was ever yet made. If so, motions would be made every day from curiosity to pick holes in the deed," etc. And the same ruling was made in Hodson v. Earl of Warrington, 3 P. Wms. 35, only there it was the case of a defendant's deed proved by a deposition taken by the defendant. It was there stated that the parties have no right to see each other's exhibits, but must file a bill, since it remained at the election of the defendant whether he would make use of the deed at the hearing or not. It was also there said in argument that the master of the rolls constantly made these orders, but that, as often as he made them, the lord chancellor set them aside.

In Attorney General v. Brooksbank, 1 Younge & J. 439, the motion by the defendant for a production and inspection of the plaintiff's papers was granted under peculiar circumstances, the chief of which was that the transactions involved the settlement of an army agent with the war department, which was challenged after 25 years; and the court said that under peculiar circumstances they would sometimes deviate from the common practice, which will bend to particular cases in order to prevent injustice.

In Jones v. Lewis, 2 Sim. & S. 242, there was a case of a written agreement by a testator to convey his estate to his daughter, which afterwards he devised to another. The defendants asked for an inspection of this agreement to enable them to answer. The production was ordered upon motion supported by affidavit that the defendant believed the instrument to be forged, and that he could not fully answer the bill before he inspected it. Vice Chancellor Leach acted in this case upon the authority of the Princess of Wales Case, but this order was afterwards vacated by Lord Eldon himself, who had granted the order in the Princess of Wales Case, as appears by the following memorandum in the original edition of 4 Sim. 324, which, by the way, is generally left out of the reprints and decisions of the English chancery reports. The memorandum is as follows: "The order made by Sir J. Leach, vice chancellor, in Jones v. Lewis, 2 Sim. & S. 242, was discharged by Lord Eldon, but without costs." This has generally been regarded as an indirect overruling of the Case of the Princess of Wales, and has been so treated by the most of the judges who have subsequently considered the question; but some of them have adhered to the Princess of Wales Case, strictly limiting it, however, to the peculiar circumstances of that case, the most important

of which was that both in that case and in Jones v. Lewis the person whose signature was said to be forged was dead, wherefore there was more reason or justice in departing from the ordinary rule, and allowing the executors an inspection of the document in order to determine whether or not there had been a forgery committed.

Lord Langdale somewhat defends the Princess of Wales Case in Taylor v. Heming, 4 Beav. 235, and explains the practice. In that case the plaintiff had offered to produce and deposit the letters referred to in his bill, but afterwards refused. He was compelled, by the usual order authorizing the answer to be delayed until he did deposit, to produce and file them for inspection. Lord Langdale said in that and other cases that the Princess of Wales Case was not amenable to the animadversions that had been made upon it, for that it could be defended upon its particular circumstances, both upon principle and authority; and he referred to the previous case of Shepherd v. Morris, 1 Beav. 175, where he had granted the same order for enlarging the time to answer until the plaintiff had filed his documents,—again under peculiar circumstances. There the plaintiff's original bill had called for an account, and the correction of errors made by the defendant in rendering reports to the plaintiff, and by an amended bill charged false entries in the defendant's accounts. The plaintiff having called upon the defendant to correct his accounts as they had been rendered to the plaintiff himself by the defendant, who was his agent, the master of the rolls said that this he could not do until the identical documents which he had been called upon to correct were produced. It was not a case of correcting his accounts as he kept them, but of correcting the accounts as he had rendered them to the plaintiff. This was a close but clear distinction, and the lord chancellor compelled the production of the documents.

Evidently afflicted with the criticisms upon this adherence to the discredited Case of the Princess of Wales, Lord Langdale, in Bate v. Bate, 7 Beav. 528, 537, again takes occasion to explain the distinction between that class of cases and the cases in which he had followed it. He ruled in Bate v. Bate that "a plaintiff, unless he specifically offers to do so by the bill, or is required to do so by the cross bill, is not bound to produce, previous to defendant being compelled to put in his answer, documents admitted to be in the plaintiff's possession, and alleged as proving his case." It was the case of a bill for the settlement of disputed partnership matters against three defendants, which charged that certain indentures mentioned in the bill were in fact prepared from instructions given by the defendants without any communication with the plaintiff, and were caused to be prepared in such a way as they thought best for their own views and purposes, and they always refused to produce or show the conveyances of the said premises, or the draft thereof, to the plaintiff, although the plaintiff had frequently applied by letter and otherwise for an inspection of the said documents, "as by reference to the correspondence in the plaintiff's possession, when produced, will appear." It was moved in behalf of the defendants that they might have a month's time to answer after the plaintiff had produced and deposited with the clerk for the inspection of the defendants the correspondence in

the said bill stated to be in the plaintiff's possession, more particularly set out in the motion. The defendant made affidavit that he had kept no copy of the letters that had been written by him to the plaintiff respecting the matters stated in the bill, and that he could not properly put in his answer to plaintiff's bill and amended bill until he had opportunity of inspecting the letters which he had written to the plaintiff, and which the bill admitted to be in the possession of the plaintiff. It was this motion which Lord Langdale, the master of the rolls, refused. He says, in explanation of his judgment:

"There have been several cases upon this subject; and I think they may be divided into two classes: First, cases like that of the Princess of Wales v. Earl of Liverpool; and, secondly, two several cases which came before me, and have been referred to, namely, Taylor v. Hemming and Shepherd v. Morris. These were cases in which the plaintiff, by his bill, not only stated that he had possession of the documents, intending to use those documents in support of his case, but he called upon the defendant to look at them, and offered to produce them for the purpose. The plaintiff, in substance and effect, stated by his bill that the defendant could not give the answer which the plaintiff desired to have for his own use unless the defendant would look at those documents; and, the plaintiff having done that, then refused to produce the documents. I think I may assume, after the investigation which this case has undergone, that there is no case whatever to be produced in which the plaintiff, charging a particular fact to be within the knowledge of the defendant, and stating further that he had evidence of the fact in letters which are in his possession, has been held bound to produce those documents before the defendant could be called upon to put in his answer. The strong impression upon my mind is that there is no such case. None so contrary to the ordinary principle has been produced, and I believe that if you were to lay it down as a proposition that the plaintiff shall not proceed until the defendant knows the evidence which the plaintiff has, you would state a proposition very much at variance with the ordinary opinion of mankind as well as of lawyers. No doubt you have a right, in this court, to look at the evidence which the plaintiff states to be in his possession; but that right is only to be obtained upon a cross bill. Every party has, in this court, that advantage, which is not to be had so effectually in any other jurisdiction. He may discover that which is in the knowledge and breast of the plaintiff before he proceeds to a hearing of the cause, but he must do it in such a way as to give the plaintiff an opportunity of stating all the circumstances connected with the matter. It is undoubtedly extremely important, when the plaintiff is called upon to furnish any discovery, that he should do it in the proper form, and be at liberty to state all the circumstances relating to the matter, and that he should have all the guard and protection which he derives from being able to give a full statement of all the circumstances belonging to the case."

This was in 1844,—but a little while after our equity rules had been promulgated,—and may be taken to fairly represent the English practice of that time, which is binding upon us.

Lord Eldon, in the Princess of Wales Case, remarked that "there is a mighty difference between simply producing an instrument and producing it in answer to a bill of discovery, where the defendant has an opportunity of accompanying the production with a statement of everything necessary to protect him from its consequences." This, taken in connection with the principle already adverted to, that no litigant can be compelled, as a matter of general right, to produce his evidence for the inspection of his adversary until he does so under the formalities that take place at the time of giving testimony for the hearing, furnishes the foundation for the general rule of prac-

tice that motions like this will not be granted; and never unless the case falls within the peculiar circumstances which make it an exception to the general rule. It is the reason why a court of equity requires either the plaintiff or the defendant to file a bill of discovery to compel the production of such documents, and all are familiar with the restrictions that are thrown around the right of discovery.

The case of Elder v. Carter, 25 Q. B. Div. 194, explains the modern English practice under legislative authority to make rules of practice upon this subject for both courts of law and equity that have superseded the old practice; but this, of course, is not binding on us. It will be found, however, even under the modern practice, which has done away with the necessity for bills of discovery, and substituted therefor a system of production upon motion, sustained and defended by the affidavits of the parties, that the courts follow substantially the same principles that governed the old practice; and parties now are required to produce only under the same circumstances where they have been compelled to produce before,—either upon a bill of discovery or upon a motion to produce. Thus, in Wilson v. Thornbury (1874) L. R. 17 Eq. 517, an order on the defendant to produce alleged forged checks for the comparison of handwriting was refused under the modern practice; and in Boyd v. Petrie, L. R. 5 Eq. 290, the master of the rolls had on motion ordered the plaintiffs to produce mortgages after an answer saying that the defendants did not know whether or not they had executed them, but, if they had, it was in ignorance of their contents, and they asked for an inspection of the documents by expert witnesses to enable them to determine whether or not it was their handwriting; but on appeal this order of the master of the rolls was vacated by the court of appeals. Boyd v. Petrie, 3 Ch. App. 818. That was a case where the motion, like the case we have in hand, was refused after answer filed. What would it have been if the motion had been made before the answer was filed?

Mr. Daniel, in his work on Chancery Practice, devotes a chapter to this subject of the production of documents, and cites the foregoing and many other cases for the text, in which he displays the practice that is binding upon us, as well as the modern practice under more recent English legislation. 2 Daniel, Ch. Prac. (6th Ed.) 1817 et seq. Instructive reading will also be found in Dick. Eq. Prac. pp. 151, 208, where the English cases are somewhat cited.

The American authorities are to the same effect, except where controlled by modern legislation. Beach, Mod. Eq. Prac. § 522, as to the production by defendants, and Id. § 524, as to the production by the plaintiff,—citing 3 Greenl. Ev. (15th Ed.) 302, 303, and many American cases. Story, Eq. Pl. (10th Ed.) § 211b: "If the bill refers to documents in the plaintiff's possession, the defendant cannot compel their production by affidavit before the answers to the petition, and only by cross bill." Id. §§ 858–860; Id. § 390; Id. p. 762, and note; Id. § 852b, and note. Kelly v. Eckford, 5 Paige, 548, holds that partnership books constitute an exception to the general rule, as they belong to both parties alike. It was in this case that Chancellor Walworth denounces the Princess of Wales Case as a political decision.

In Eager v. Wiswall, 2 Paige, 369, it is stated to be a matter of course to compel the inspection of defendant's books or papers made a part of the answer; but Chancellor Kent, in Watson v. Renwick, 4 Johns. Ch. 381, clearly shows that this is rather a loose statement of the practice. In the last case Chancellor Kent refused to order the production of documents by defendants, and states the rule more accurately than Chancellor Walworth has done. Chancellor Kent especially approves Lord Eldon's reasons for the caution of courts in compelling the production of documents by motion, because producing papers in answer to a bill of discovery furnishes the party a safeguard by enabling him to state explanatory circumstances accompanying the production, which cannot be done where the production is compelled by summary motion.

In Denning v. Smith, 3 Johns. Ch. 409, an order was refused as vexatious, and in Lupton v. Johnson, 2 Johns. Ch. 429, an order requiring the plaintiff to produce bonds in his possession was vacated, and it was held that a cross bill was necessary, although the proceeding by motion was less expensive.

In Commercial Bank v. Bank of New York, 4 Hill, 516, a party was compelled to produce an exhibit to a deposition, confessedly contrary to the English practice, and reasons are given for the difference between the practice there and in this country.

In Evans v. Staples, 42 N. J. Eq. 584, 8 Atl. 528, an order for the production of documents upon a co-defendant was refused, and it was held that a bill of discovery was required. The case especially approves Kelly v. Eckford, supra.

Our equity rule 72 declares that, "where a defendant in equity files a cross bill for discovery only, against the plaintiff in the original bill, the defendant to the original bill shall first answer thereto before the original plaintiff shall be compelled to answer the cross-bill." This was evidently intended to settle a somewhat disputed question of practice, then existing in England, which had relation to the subject we have in hand, as well as to other situations in equity practice. It shows that, if the defendant in this case had filed a cross bill asking for a discovery of the plaintiff's exhibit on the same grounds that are stated in this petition, the plaintiff would not be compelled to answer that cross bill until the defendant had answered the original bill. And it will be found that the reason for this rule is the very reason that is given in the foregoing cases for the refusal of this motion, namely, that the defendant must answer the bill upon his own knowledge and information before he can require the discovery of evidence in the hands of the plaintiff. After he has answered the original bill upon his own knowledge and information and belief as then existing, he may procure discovery from the plaintiff in aid of the case he has made by his answer, or, after that discovery, he may amend his answer, and take advantage of the circumstances shown by the discovery; but, unless there are peculiar circumstances, as in the Case of the Princess of Wales, which form an exception to the rule requiring a bill of discovery, the plaintiffs will not be required, upon a mere motion, to produce documents to aid the defendants in making their answer. Motion denied.